UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHERYL M. MERCKLING,                    )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )        Case No. 4:11 CV 66 CDP
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
        Defendant.                       )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Cheryl M. Merckling's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401 et seq.  Merckling claims she is disabled because of arthritis in her back,

migraines, nerve damage in her hands, and depression.  The relevant time period

for consideration of Merckling's claim is from January 5, 2005, the alleged onset

date, through December 31, 2008, the date her insured status expired.[1]  Because I

---

[1]To meet the requirements for insured status, an individual is required to have 20 quarters
of coverage in a 40-quarter period ending with the first quarter of disability.  See 42 U.S.C. §§
416(i)(3)(B) and 423(c)(1)(B); 20 C.F.R. § 404.130.  To be entitled to benefits under Title II
Merckling must establish that she was disabled prior to the date her insured status expired, which
is December 31, 2008.

find that the decision denying benefits was supported by substantial evidence, I will affirm the decision of the Commissioner.

## Procedural History

Merckling filed her application for disability benefits on March 22, 2007. Merckling's application was denied initially.  Plaintiff requested a hearing before an Administrative Law Judge, which was held on April 23, 2009.  On May 19, 2009, the ALJ issued a decision that Merckling was not disabled.  On July 13, 2009, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council of the Social Security Administration.  On November 25, 2009 and April 28, 2010, the Commissioner received new evidence from Merckling's treating physicians.  The Appeals Council denied her request for review on December 10, 2010.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

Cheryl Merckling was fifty years old at the time of the ALJ's decision.  She has a 12th grade education and has most recently been employed as an account analyst.  She alleges an onset disability date of January 5, 2005, when she was involved in a motor vehicle accident.  She claims inability to work because of arthritis in her back, migraines, nerve damage in her hands, and depression.

-2-

<u>Medical Records</u>

On February 23, 2004 Merckling had several X-rays.  An X-ray of the lumbosacral spine showed degenerative disc disease at L5-S1.  The other lumbar discs were normal. An X-ray of the cervical spine showed no evidence of fracture, malalignment, prevertebral swelling, disc space narrowing, or asymmetry.   X-rays of the right and left shoulders shoulder showed that the A-C joint was narrow, but that there was no malalignment, fracture, or any unusual soft tissue calcifications.

On January 5, 2005, Merckling was admitted to St. John's Mercy Medical Center following a motor vehicle accident.  Merckling complained of head, back, and, neck pain, dizziness; changes in her vision; and numbness in her extremities. The physician, Dr. Backer, found that Merckling suffered from post concussive syndrome.  An initial examination showed that Merckling's neurological function was intact.  The examination notes show that there was no injury to plaintiff's head, abdomen, back, arms, or legs.  Some tenderness was noted in her legs and in her knees.  Dr. Backer noted a slight abrasion over Merckling's right forehead at the hairline.  CT scans of the head and spine were unremarkable.  A review of her systems showed that Merckling was awake and alert with a motor of four plus over five on the right side and 5/5 on the left.  Merckling was diagnosed with a mild concussion and kept in the hospital for observation.  CT scans taken while

Merckling was admitted to the hospital showed mild osteophytic spurring of the right knee and degenerative changes in the lumbar spine, but were otherwise normal.  Merckling was discharged on January 11, 2005.

On August 8, 2005, Merckling was admitted to Barnes-Jewish Hospital complaining of increasing swelling and redness under her left eye.  Merckling was given intravenous antibiotics to treat left periorbital preseptal cellulitis.  She was discharged on August 11, 2005.

On August 15, 2005, Merckling was treated at the emergency department of Barnes-Jewish Hospital with a chief complaint of eye irritation.  She claimed her previous eye pain had worsened.  She also complained of headaches and was diagnosed with migraines.  The nurses notes state that Merckling was alert, moved all extremities well, and was discharged in an ambulatory state.  Merckling was prescribed Sumatriptan for her headaches.

Dr. Riaz Naseer examined Merckling on November 19, 2005.  Merckling's chief complaint at the time was back  pain with a "funny sensation in her left lower extremity" causing reduced strength.  Merckling reported to Dr. Naseer that she had been in an automobile accident in January of 2005.  Dr. Naseer noted that Merckling was awake, alert, cooperative, and in no obvious acute distress.  He noted a waddling gait, but that she was able to walk without any assistive device.

-4-

Dr. Naseer also noted difficulty performing tandem and in bending forward, backward, and laterally.  Her Romberg's test was slightly positive and she had some difficulty getting up on the examination table.  Dr. Naseer's neurological examination was overall normal.  He noted some sluggishness in the reflexes in Merckling's upper and lower extremities.  The doctor noted reduced effort on the motor examination, but stated that her strength in her upper and lower extremities was normal at 5/5.  Testing revealed her grip strength in both hands to be 5/5 as well.

Dr. Naseer stated his clinical impressions were that Merckling had chronic back strain with paresthesia in the left lower extremity raising the possibility of radiculopathy.  The doctor found that Merckling would be capable of using her hands for fine finger function such as buttoning and unbuttoning, and picking up small objects.  Dr. Naseer also concluded that Merckling would have no difficulties in sitting, standing, walking, and lifting.

On May 16, 2006, Merckling was seen at Barnes-Jewish Hospital's emergency department complaining of eye pain, swelling, and drainage.  She was diagnosed as having a sty.  Emergency department nurses noted that Merckling moved all extremities well, was alert and oriented, and was ambulatory.

Nerve conduction studies of Merckling's arms conducted on August 30,
2006 at Missouri Baptist Hospital showed normal nerve conduction with no
evidence of neuropathy.  X-Rays of Merckling's wrists taken on September 16,
2006 showed mild osteoarthritis in both wrists.

Dr. Zamir Eidelman was Merckling's general physician.  Dr. Eidelman's
treatment notes indicate that before the January 2005 accident Merckling came to
him regularly with reports of pain.  On May 28, 2002, Merckling complained of
back pain and was prescribed Tylenol  #3.  On June 14, 2003, Merckling
complained of numbness in her legs and was assessed with lower back pain.  From
February 2004 through October of 2004 Merckling came to Dr. Eidelman
complaining of different kinds of pain on at least nine different occasions.  She
was frequently prescribed medication to help manage the pain.  Dr. Eidelman's
notes also indicate that Merckling failed to follow up on his requests to have
testing, such as MRIs, conducted or to contact specialists.  On October 24, 2004,
Dr. Eidelman wrote in his treatment notes regarding Merckling's complaints of
back pain, "I have been talking to her for more than a year regarding this and she
doesn't follow my advice but she does call for pain medications."  Dr. Eidelman's
treatment notes from February, March, April, July, August, and October of 2004
all indicate that Merckling came to Dr. Eidelman's office complaining of back

-6-

pain related to a motor vehicle accident that occurred in February of 2004.  Those notes also indicate that Merckling failed to seek testing and did not contact specialists recommended by Dr. Eidelman.

Following her accident in January of 2005, Merckling again sought treatment from Dr. Eidelman.  On January 20, 2005, Dr. Eidelman saw Merckling and recommended that she have a CT scan and contact Dr. Barry Singer.  Dr. Eidelman's treatment notes indicate that Merckling told him that she had suffered a fractured skull in the accident.  Dr. Eidelman's notes from January 25, 2005, and February 15, 2005, indicate that Merckling failed to follow up with Dr. Singer at this time or to seek the requested diagnostic testing.

Merckling saw Dr. Eidelman for a wide range of other ailments.  Dr. Eidelman's notes from February 3, 2005, indicate that Merckling called complaining of severe headaches, back spasms, and neck spasms.  On June 12, 2006, notes indicate an assessment of chronic headaches.  On November 28, 2006, Merckling again saw Dr. Eidelman for migraines.  Merckling was noted to be alert and oriented with normal strength and gait.  The notes also indicate that Merckling did not wish to have lab work performed.  On February 8, 2007, Merckling saw Dr. Eidelman for pain management for her hands.  She also complained of

-7-

depression.  She was noted to be alert and oriented, and she was referred to a

specialist.

Merckling was seen regularly for her headaches by Dr. Barry Singer.  Dr.

Singer's treatment notes continually state that Merckling was alert and oriented,

had normal gait, had normal tandem, and had normal motor strength.  A June 15,

2006,  MRI of her brain showed nothing medically remarkable.  A letter dated July

17, 2006, from Dr. Singer to Dr. Eidelman states that he diagnosed her with

migraines with aura and prescribed Topamax to prevent headaches and Fiorocet to

take for pain relief.  Dr. Singer's treatment notes indicate that Merckling's

headaches responded well to treatment by medication.  Specifically, Dr. Singer

saw Merckling on October 17, 2006, when she claimed to be having two to three

headaches per week and reported no cognitive problems.  On February 12, 2007,

Merckling again reported two to three headaches per week.  By June 6, 2007,

Merckling reported only three to four headaches per month.  On February 1, 2008,

Merckling again reported three to four headaches per month.  By August 1, 2008,

Merckling's headaches had reduced to two to three  per month and she reported

that the Fioricet and Codeine were working well despite missing a dose of

medication two times per week.  Dr. Singer's treatment notes also report continued

coffee use and minimal weight loss despite his suggestions that cutting caffeine

and losing weight could improve Merckling's condition. Only in June of 2009, after the ALJ made his determination that Merckling was not disabled, do the medical records show a change for the worse. On June 24, 2009, Merckling Reported to Dr. Singer that she experienced daily headaches with two to three severe headaches per week.

Merckling saw Dr. Martin Boyer for pain related to her wrists. A letter from Dr. Boyer to Dr. Eidelman, dated September 19, 2006, states that Merckling suffered from bilateral wrist pain since her January 2005 car accident. X-rays of Merckling's wrists showed some CMC and STP arthritis, but little else in terms of scaphoid malalignment with no widening of the scapholunate interval. Notes from October 13, 2006 state that an MRI of the wrists showed basilar thumb joint arthritis. Merckling was put in spica splints and was given Celebrex. She was prescribed Vicoden to help her sleep. The splints were removed on November 13, 2006, and Merckling's hands were examined. On December 12, 2006, Dr. Boyer again saw Merckling and stated that carpal tunnel release surgery would be unnecessary due to the absence of specific physical findings. He referred Merckling to Dr. Swarm for pain management.

Merckling also attempted some physical therapy for her knee at PRORehab at the suggestion of Dr. Eidelman. According to the physical therapist, Julie

Bokermann, after forty-eight days Merckling's condition remained unchanged. Merckling was given some exercises to perform at home and did some in-house therapy.  Merckling cancelled several appointments—one to go out of town—and rescheduled others.  In her Letter to Dr. Eidelman at the end of the treatment, Bokermann stated that Merckling had a low tolerance to all exercises and was generally unwilling to perform the standing exercises due to "too much pain." Bokermann was unsure whether Merckling actually performed her exercises at home.

Dr. Terry Dunn, Ph.D., completed a psychiatric review technique form on July 5, 2007.  He reported that there was no medically determinable mental impairment.  Medical records from Washington University Medical Center state that Merckling was prescribed Effexor, a drug typically used to treat depression, by her gynecologist to treat her menopause related hot flashes.

<u>Testimony</u>

At the time of the hearing on April 23, 2009, Merckling was fifty years old. She completed high school and took a few college courses, but did not receive an associate's degree of any kind.  Merckling lives with her husband and they do not have any children living with them.  She has gained around thirty pounds since she stopped working, which she attributes to her lack of activity.

-10-

Merckling most recently worked in collections for the May Company.  She collected overdue bills by calling customers and attempting to help them figure out a way to pay.  She worked at a desk, used a headset, and worked with a computer. Her job did not require much lifting or walking.  She left her job because a manager attacked her and hurt her back.  Merckling testified that she had difficulty sitting for long periods of time after that.  Merckling did not work for anyone else after leaving the May Company.  Before working for the May Company she worked in a similar positions for GC Services and Business Response.  She worked in fast food both at the counter and preparing food.  Merckling also worked at a grocery store deli counter, for a day care, and for a cleaning service.

Merckling testified that she was involved in a motor vehicle accident in January of 2005.  She was coming back from church and her car was "T-boned" by another car that ran a red light.  Merckling testified that her head hit the rear-view mirror and bounced off the windshield a few times. She put her hands up when she saw the other car and her hands had bent all the way back, and the dashboard came up into her knees.  Following the accident, Merckling was in the hospital for four days.  She was treated for a concussion and neck pain and was released with Percocet and Valium.  Merckling testified that she has not gone back to work since the accident.

Merckling testified that she gets migraine headaches which are triggered by computers and lights.  She gets these headaches several times a month, and they are progressively getting worse.  Merckling testified that they can last for a couple of days and are like a dome around her head.  She described the pain as "agony of hell."  When she has a headache she typically has to "live in the dark."  Merckling takes Topomax to prevent her headaches twice a day, and she takes Fioricet to help treat them.  Merckling testified that the Fioricet does not work right away but it does help.

Merckling also testified that she has problems with her hands.  She cannot open them all the way and her wrists are very weak.  She said that her grip strength was very poor, and it takes a lot of control and concentration to write her name with a pen.  She cannot work buttons or zippers.  Her husband has to shower her.  She cannot brush her teeth well and must use two hands.  Merckling was given braces for her knuckles and wrists, but they are confining and she does not wear them because they seemed to be weakening her wrists.

Merckling testified that on a typical day she will lie in bed and hope that her husband opened up a bottle of water and a liquid breakfast type drink because she cannot open them.  She talks to her daughter on the phone and watches television.  She cannot do any housework because of her hands and legs.  She can put a bowl

of soup in the microwave.  She cannot take the stairs because a sharp pain will

overcome her and freeze her, and she no longer drives because her hands are

numb.  Merckling testified that she had not gone to the grocery store since before

Christmas, four months prior to the April hearing.  She goes to church with her

husband once a week but does not sit the whole time.  Merckling and her husband

are members of the Elks and so they may go to the lodge on Fridays to have

dinner.   Because of her hands, her husband cuts her meat for her.  Merckling can

no longer do ceramics.  She takes sleeping pills and cannot sleep on her back or

sides.  Her doctor recommended that she go on a diet and she is slowly losing

some weight.  Merckling received around $30,000 from a lawsuit following her

car accident.  She smokes about half a pack of cigarettes a day, but she needs her

husband to light a candle so she can smoke them because she cannot use a lighter.

<u>Evidence Submitted to the Appeals Council</u>[2]

The following additional evidence was submitted to the Appeals Council,

relating to medical treatment sought after the ALJ denied the claim in May of

2009.  Merckling visited Dr. Singer on June 24, 2009.  She reported daily

---

[2]Although this evidence was not submitted to the ALJ, "where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007).

headaches with severe headaches two to four times per week.  She reported a

sensitivity to light and to using computers.  Dr. Singer diagnosed Merckling with

migraine with aura and depression.  Dr. Singer also filled out a Headaches

Residual Functional Capacity Questionnaire provided to him by Merckling's

attorney.  The questionnaire is composed of a list of twenty-five questions with

either short blanks for answers or places where the doctor may check off an

answer.  Dr. Singer's Questionnaire indicates that plaintiff had daily headaches

with two to three severe headaches per week.  Dr. Singer indicated that Merckling

may need to take one unscheduled break of up to two hours during the workday,

and that Merckling would need to miss work more than four times per month.  The

assessment also states that Merckling would be able to tolerate low stress jobs.

The questionnaire does not elaborate as to the specific medical basis of these

findings or as to why Merckling will need to miss work or take a daily break.

Merckling saw Dr. Eidelman on June 22, 2009, complaining of chronic pain

in her hands that was getting worse.  Dr. Eidelman filled out a Physical Residual

Functional Capacity Questionnaire.  Dr. Eidelman stated that Merckling could sit

for more than two hours at a time and could stand for ten or fifteen minutes at a

time.  Dr. Eidelman indicated that Merckling needed a job that permitted shifting

positions at will from sitting, standing, or walking.  He also marked that

-14-

Merckling could rarely lift twenty pounds, could occasionally lift ten pounds, and could frequently lift less than ten pounds.  Merckling was noted as being able to rarely twist, stoop, crouch, squat, or climb stairs.  Dr. Eidelman guessed that Merckling would miss abut three days of work per week.  Dr. Eidelman also indicated that he had not addressed Merckling's ability to walk and that his sitting and standing time periods were "just a guess."  He indicated that he could not tell if Merckling was a malingerer and does not know if her condition will last twelve months.  Dr. Eidelman stated that Merckling had not provided enough information to be able to tell how many hours in an eight hour work day she was able to stand and walk.  In his additional comments, Dr. Eidelman stated that Merckling came to his office irregularly and that he and his staff had assessed her medically without a view to her ability to work.  He suggested that another doctor should assess her occupational abilities.

After the ALJ's decision, Merckling was also seen by Dr. Anthony Margherita at West County Spine & Sports Medicine in St. Louis, Missouri.  On October 7, 2009, Dr. Margherita indicated diagnoses of cervical spondylosis, cervical radioculpathy, and carpal tunnel syndrome.  He prescribed a C5-6 epidural steroid injection.  Dr. Margherita's notes from November 18, 2009 indicate that Merckling had better mobility after receiving the shot.  Dr.

Margherita's notes from August 18, 2009 and September 24, 2009 note that

Merckling was difficult to assess due to diffuse complaints.

      Dr. Mali Dave administered the epidural steroid injection prescribed by Dr.

Margherita.  Dr. Dave's assessment of Merckling states that she was alert,

oriented, anxious and agitated.  The notes state that Merckling's behavior during

the procedure was inappropriate and that Merckling was asked several times if she

wanted the shot.  Dr. Dave noted Merckling's strength was "probably okay" but

that she did not use full effort on the motor exam.  The notes further state that

Merckling needed help to change her clothes, but after the procedure she was

observed changing clothing without any help.  The procedure went well and

Merckling was discharged home with instructions not to drive for 24 hours.

## Legal Standard

      The court's role on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.  Gowell

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); 42 U.S.C. § 405(g).  Substantial

evidence is less than a preponderance, but is enough so that a reasonable mind

would find it adequate to support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d

1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record

as a whole to support the Commissioner's decision, a court may not reverse it

because substantial evidence exists in the record that would have supported a

contrary outcome, id., or because the court would have decided the case

differently.  Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).  In

determining whether existing evidence is substantial, a court considers "evidence

that detracts from the Commissioner's decision as well as evidence that supports

it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v.

Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)). Where the Commissioner's findings

represent one of two inconsistent conclusions that may be reasonably drawn from

the evidence, however, those findings are supported by substantial evidence.

Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (internal citation

omitted).

To determine whether the decision is supported by substantial evidence, the

court is required to review the administrative record as a whole and consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-
exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

-17-

(6) the testimony of vocational experts when required, which is based upon

a proper hypothetical question.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir.

1980); Stewart v. Sec'y of Health and Human Servs., 957 F.2d 581, 585-86 (8th

Cir. 1992).

Disability is defined in the social security regulations as the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a),

416.905(a).  In determining whether a claimant is disabled, the Commissioner

must evaluate the claim using a five step procedure.  20 C.F.R. §§ 404.1505(a),

416.905(a).

First, the Commissioner must decide if the claimant is engaging in

substantial gainful activity.  If the claimant is engaging in substantial gainful

activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment

which significantly limits the claimant's physical or mental ability to do basic

work activities.  If the claimant's impairment is not severe, he is not disabled.

-18-

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. §§ 404.1520, 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See, e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).  In considering the subjective complaints, the

ALJ is required to consider the factors set out by <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and(6) the claimant's functional restrictions.

<u>Id.</u> at 1322.  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's findings.  <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  <u>Hildebrand v. Barnhart</u>, 302 F.3d  836 838 (8th Cir. 2002).

A treating physician's opinion should ordinarily not be disregarded and is entitled to substantial weight.  <u>Singh</u>, 222 F.3d at 451.  A treating physician's opinion concerning a claimant's impairment will be granted controlling weight if

-20-

the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in

the record.  Id.  While a treating physician's opinion is usually entitled to great

weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically

control, since the record must be evaluated as a whole."  Prosch, 201 F.3d at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard

the opinion of a treating physician in situations in which other medical

assessments "are supported by better or more thorough medical evidence" or in

which a treating physician gives inconsistent opinions that undermine the

credibility of the opinions.  Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th

Cir. 1997)).  In any event, whether the ALJ grants a treating physician's opinion

substantial or little weight, the regulations require the ALJ to "always give good

reasons" for the particular weight the ALJ chooses to give the opinion.  Singh, 222

F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).

Under 20 C.F.R.§ 404.970(b) if a claimant files additional medical evidence

with a request for review before date of the Commissioner's final decision, the

Appeals Council must consider the additional evidence if the additional evidence

is (a) new, (b) material, and (c) relates to the period on or before the date of the

ALJ's decision.  <u>Williams v. Sullivan</u>, 905 F.2d 214, 216 (8th Cir. 1990).  When

evidence is submitted after the ALJ's decision and is considered by the Appeals

Council, that evidence becomes part of the record.  <u>Bergmann v. Apfel</u>, 207 F.3d

1065, 1068 (8th Cir. 2000).  This court's role is to determine whether the ALJ's

decision is "supported by substantial evidence on the record as a whole, including

the new evidence submitted after the determination was made."  <u>Id.</u> (quoting <u>Riley</u>

<u>v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1999).  When conflicting physician reports

are submitted to the Appeals Council as new evidence, this court must decide how

the ALJ would have weighed them relatively.  <u>Jenkins v. Apfel</u>, 196 F.3d 922, 924

(8th Cir. 1999).

## The ALJ's Findings

The ALJ issued his decision that Merckling was not disabled on May 19,

2009.  In reaching his decision, the ALJ followed the five-step sequential

evaluation process, finding at step one that Merckling had not engaged in

substantial gainful activity during the period from her alleged onset date of

January 5, 2005, through her last insured date of December 31, 2008.  At step two,

the ALJ determined that Merckling had the severe impairments of migraine

headaches, degenerative changes of the lumbar spine, and mild osteoarthritis of

the right knee and wrists.  At step three, the ALJ concluded that none of

Merckling's impairments or combination of impairments met or exceeded one of

the listed impairments in 20 C.F.R. Part 404, subpart P, appendix 1.

Moving to step four, the ALJ determined that, through the date last insured,

Merckling had the residual functional capacity to perform the full range of light

work.  In making this determination, the ALJ found that while Merckling's

medically determinable impairments could be expected to produce the symptoms

she claimed, Merckling's statements concerning the "intensity, persistence and

limiting effects of these symptoms are not entirely credible."  The ALJ found that

the medical evidence did not support a finding of disability.

The ALJ found that Dr. Naseer's opinion that Merckling would have no

trouble sitting, standing, or walking in addition to Dr. Naseer's opinion that she

maintained fine motor skills sufficient for buttoning and unbuttoning rendered her

complaints of inability to grip or sit for long periods of time not credible.  The lack

of a walking assistance device and her infrequent treatment for back pain

undermined her assertions.  Merckling's claims of weak grip strength were

undermined by Dr. Naseer's findings of 5/5 bilateral strength.  Merckling's claims

of difficulty walking were undermined by Dr. Singer's multiple notations that

Merckling's gait and tandem were normal.  The ALJ also found that the lack of

-23-

any objective evidence that Merckling needed physical therapy for her knee undermined her credibility.

The ALJ found that Dr. Singer's notes indicating that Merckling was responding well to medication for her headaches undermined her assertion of their severity. The ALJ discounted Merckling's claimed depression by noting that her anti-depresant, Effexor, was prescribed by her gynecologist to treat hot flashes, and that Dr. Singer prescribed that drug without making any objective findings of depression or referring Merckling to a psychiatrist.

The ALJ further found that Merckling appeared to be motivated for seeking disability benefits. He found she had not worked since 2003 and her only substantial gainful activity was between 1998 and 2003. The ALJ found that Merckling had applied for disability five times since 1992. She received about $30,000 in a settlement for her car accident. Merckling's apparent motivation for seeking benefits undermined her credibility.

The ALJ found that none of Merckling's treating or examining physicians had stated that Merckling was disabled and unable to work. He found she had consistently been noted to be alert, oriented and in no acute distress. The record, which contained no physician opinion of disability, detracted from the claimant's subjective complaints.

Next, the ALJ found that the performance of Merckling's past relevant work as an account analyst did not require the performance of work-related activities precluded by the claimant's residual functional capacity.  The ALJ noted only that in comparing Merckling's residual functional capacity with the physical and mental demands of her prior occupation, Merckling "was able to perform it as it was actually performed."  Therefore, the ALJ found that Merckling was not disabled.

## Discussion

Merckling makes two arguments in her appeal of the ALJ's opinion.  The first is that the ALJ's finding of residual functional capacity is not supported by substantial evidence because it is not supported by "some" medical evidence as required by the Eighth Circuit's opinions in Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001).  Merckling's second argument is that the ALJ's determination of disability is not supported by substantial evidence because the ALJ failed to perform a detailed function by function analysis of Merckling's past work and residual functional capacity as required by Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999).  Because I find that the decision is supported by "some" medical evidence and the failure to perform a function by function analysis did not prejudice Merckling, I find that

substantial evidence on the record exists to find Merckling not disabled, and I
affirm the ALJ's opinion.

### "Some" Medical Evidence

Merckling's reliance on Singh and Lauer is misplaced.  It is true, as
Merckling claims, that a "claimant's residual functional capacity is a medical
question" and must be supported by medical evidence.  Lauer, 245 F.3d at 704.
But Lauer involved an ALJ who substituted his own lay opinion for that of
medical experts.  Id. at 703-704.  Singh involved a challenge to the weight an ALJ
gave to a treating physician's opinion that was available at the time of the hearing.
Singh, 245 F.3d at 452.  Here, the ALJ did not substitute his opinion for that of
medical experts.  He relied specifically on the opinion of Dr. Naseer and the
treatment notes of Dr. Singer and Dr. Eidelman.  Moreover, the ALJ did not have
Dr. Singer's or Dr. Eidelman's opinion available to him at the time of the hearing.

Merckling's first argument is truly that, in light of opinions of treating
physicians Drs. Singer and Eidelman submitted after the ALJ's decision, there is
no longer substantial evidence on the record as it now stands to support the ALJ's
finding that Merckling was not disabled.  When evidence is submitted to and
considered by the Appeals Council, that evidence becomes part of the record.
Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999).  When the Appeals Council

denies review after considering new evidence, I must determine "whether the

ALJ's decision was supported by substantial evidence on the record as a whole,

including the new evidence."  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir.

2007).  Evaluating such evidence requires me to determine how the ALJ would

have weighed the newly submitted evidence if it had been presented at the original

hearing.  Jenkins, 196 F.3d at 924.  The evidence submitted to the Appeals

Council by Merckling consists of, among other things, two residual functional

capacity questionnaires filled out by treating physicians, Drs. Eidelman and

Singer.  Because these opinions conflict with the opinion of the examining

physician, Dr. Naseer, I must decide how the ALJ would have weighed the

opinions relatively.  Id.

A treating physician's opinion is generally given controlling weight if it is

"well supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence" on the record.

Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (quoting 20 C.F.R. §

404.1526(d)(2)).  The opinions of a treating physician may be discounted,

however, when they are inconsistent with the overall assessment of the physician

or the opinions of other physicians, "especially when those opinions are supported

by more or better medical evidence."  Id. (citing Prosch v. Apfel, 201 F.3d 1010,

1013-14 (8th Cir. 2000)).  A treating physician's opinion deserves no greater respect than any other physician's opinion when the opinion consists of "nothing more than vague, conclusory statements."  Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004).  In discounting a treating physician's opinion, the Commissioner should give "good reasons" for doing so.  Davidson v. Astrue, 501 F.3d at 990. Considering these guidelines, I conclude that the ALJ would have discredited the opinions of both Dr. Singer and Dr. Eidelman.

Dr. Eidelman completed a physical residual functional capacity questionnaire on July 15, 2009.  The opinion states that Merckling was in a motor vehicle accident and had chronic pain and migraines.  Dr. Eidelman noted that Merckling would need to walk or lie down at will; could sit for more than two hours, but would need to walk, lie down, or stand after that; needed a job that permitted shifting at will from standing, sitting, or walking; and could rarely twist or stoop.  He estimated that she would miss three days of work per month due to her impairments.  This opinion can be discredited because it is not supported by objective "clinical and laboratory diagnostic techniques," is inconsistent with Dr. Eidelman's treatment notes and the record as a whole, contains internal inconsistencies, and is based on vague, conclusory statements.

Rather than being based on objective medical diagnostic techniques, Dr.

Eidelman's opinion is based on Merckling's subjective complaints of pain. Dr. Eidelman's opinion states that there are no major clinical findings to account for Merckling's complaints of pain besides "stress by discomfort." The opinion describes the severity of the pain with the caveat "per patient." Further, as the ALJ noted, Dr. Eidelman's treatment notes indicate few objective indications of Merckling's limitations.

Dr. Eidelman's treatment notes are inconsistent with his opinion concerning Merckling's limitations. At no point in his treatment notes did Dr. Eidelman indicate that Merckling was subject to any kind of limitations, and he recommended that she participate in physical therapy. His notes consistently show that Merckling was alert and oriented; had normal memory and affect; had full range of motion; and had normal gait, strength, and tone. She is mostly noted as having no edema or clubbing of the extremities. The lack of objective findings in the face of consistently normal strength, reflex, and range of motion studies suggest that impairments are not disabling. Gowell v. Apfel, 242 F.3d 793, 797-98 (8th Cir. 2001).

Dr. Eidelman's opinion also indicates that he lacked sufficient information. "Physician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies." Guilliams v.

-29-

Barnhart, 393 F.3d 798, 803 (8th Cir. 2005).  Dr. Eidelman's opinion states that he

treated Merckling infrequently.  His opinion states that the limitations are "just a

guess."  Dr. Eidelman indicated that he could not tell if Merckling was a

malingerer, and he suggested that his staff did not evaluate Merckling with a view

to her occupational abilities and that an independent doctor should do so.  Taken

together, these qualifications undermine and contradict his opinions concerning

Merckling's impairments.

Finally, Dr. Eidleman's opinion, as noted above, was in the form of a

questionnaire.  The questionnaire was made up of seventeen questions, some of

which required Dr. Eidelman to check a box and others had short answer blanks.

The checklist format of the opinion tends to hurt its evidentiary value.  Holstrom

v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("[T]he checklist format,

generality, and incompleteness of the assessments limit their evidentiary value.").

The ALJ would likely have discredited Dr. Eidelman's opinion because it

consisted of nothing more than vague, conclusory statements.

Another of Merckling's treating physicians, Dr. Singer, completed a

headaches residual functional capacity questionnaire on August 4, 2009.  The

questionnaire indicated that Merckling had daily headaches with severe headaches

two to three times a week.  The opinion states that the severe headaches were

typically associated with photophobia, phonophobia, and nausea.  Dr. Signer indicated that the headaches would require Merckling to miss up to four days of work per month, and they would require her to take one unscheduled break for up to two hours of every eight hour work day.  Like Dr. Eidelman's opinion, Dr. Singer's opinion is not supported by objective "clinical and laboratory diagnostic techniques," is inconsistent with his treatment notes and the record as a whole, and is based on vague, conclusory statements.

Dr. Singer's opinion is supported by sparse objective evidence.  The opinion notes that an MRI of Merckling's brain taken on June 15, 2006, was normal.  The only objective indication of disease listed is a June 27, 2009, MRI of the cervical spine which demonstrated a disc bulge at C6-7.  Dr. Singer notes that this could reasonably be expected to cause headaches.  However, this MRI was conducted after Merckling's insured period had expired.  Scans of the area during Merckling's insured period show no such defect.  A CT scan conducted directly after Merckling's accident shows a negative scan of the cervical spine.  While Dr. Singer checked that her history of head injury could also support her subjective complaints, his opinions concerning Merckling's limitations appear to be based more on Merckling's subjective complaints of pain than on the objective medical evidence.

-31-

Dr. Singer's opinion is also plagued by some internal inconsistencies. Despite the limitations noted in his opinion, Dr. Singer states that Merckling's prognosis is fair and that she is capable of low stress jobs.

More significantly, Dr. Singer's opinion is inconsistent with his treatment notes.  At no point did Dr. Singer indicate in his treatment notes that Merckling was subject to any kind of limitation.  Dr. Singer's treatment notes show that Merckling responded well to her medication, going from initial complaints of headaches occurring two to three times per week in July 2006, to three to four times per month in February 2008, and then two to three times per month in August of 2008.  In other words, these records show that her conditions was improving.  In February 2008, Merckling said her Fioricet was working somewhat well, and in August of 2008, she said it was working well despite missing two doses per week.  Impairments that can be controlled through medication are not disabling.  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).  As the ALJ noted, Dr. Singer's physical examinations show that Merckling was consistently alert, oriented, and in no acute distress.  She was also consistently noted as having normal gait, strength, and tandem.  Dr. Singer's treatment notes are simply inconsistent with his opinion that Merckling would need to miss up to two hours of work per day.

Moreover, Dr. Singer's opinion is in the same checklist form as Dr. Eidelman's, which serves to hurt its evidentiary value.  Dr. Singer's questionnaire was composed of twenty-five questions involving check boxes and short answer blanks.  Dr. Singer failed to complete many of the blanks which asked him to explain his checked answer.  This is the type of vague, conclusory statement that cannot serve as a controlling physician opinion.

Importantly, both treating physicians' opinions are inconsistent with the findings of examining physician Dr. Naseer, whose determinations were made after an objective examination of Merckling.  Physician opinions that are supported by more or better medical evidence may be used to discredit the opinions of treating physicians.  Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011).  Dr. Naseer concluded that Merckling's range of motion indicated that she would have no problems with fine finger function such as picking up small objects or buttoning and unbuttoning.  Dr. Naseer additionally concluded that Merckling would have no trouble sitting, standing, walking, or lifting.  His opinion was based on objective range of motion tests conducted in his office.  While Dr. Naseer noted that Merckling had a "somewhat waddling" gait, had somewhat sluggish reflexes, and had some difficulty getting on the examination table, he also found that she had good grip strength, normal strength in her extremities, a good range of motion,

-33-

no evidence of cerebullar deficit, and that she could walk without an assistive device.  Dr. Naseer also noted that Merckling was awake, alert, and in no acute distress.  Dr. Naseer found that Merckling failed to put forth full effort during the testing.  Dr. Naseer's findings are consistent with Drs. Singer's and Eidelman's treatment notes which indicate normal gait, tandem, and strength.  They are also consistent with the objective medical imaging, which, as detailed above, showed mostly normal results.  As the Commissioner suggests, Dr. Naseer's opinion is consistent with his objective medical testing and with the record as a whole.

The opinions of the treating physicians are also inconsistent with evaluations conducted during Merckling's several visits to different hospitals.  In her medical records, Merckling is consistently noted to be alert, ambulatory, and to have full strength in her extremities.  Furthermore, the opinions of the treating physicians are inconsistent with other medical evidence submitted to the Appeals Council after the hearing.  Most notably, their opinions are inconsistent with the notes of Dr. Anthony Margherita who treated Merckling for back pain beginning on August 15, 2009.  This is after the expiration of Merckling's insured period.  Dr. Margherita's notes suggest difficulty in assessing Merckling due to her diffuse complaints.  His notes dated October 7, 2009, show that he recommended that Merckling get an epidural steroid injection.  Dr. Margherita's notes indicate that

-34-

she recieved an injection at the C6-7 area of her back and that after receiving the

injection Merckling noted improvements in her condition, better mobility, and less

tingling.  Impairments that can be treated with medication cannot be considered

disabling.  Indications that Merckling's ailments responded well to the injection

are inconsistent with the treating physicians' opinions.

Notes from Dr. Malti Dave, who administered Merckling's injection, are

also inconsistent with the treating physician's opinions.  Dr. Dave's notes indicate

that Merckling acted inappropriately during the procedure and he asked her

several times whether she actually wanted the injection.  Dr. Dave noted

Merckling's strength was "probably okay" but that she did not put forth full effort

on the motor exam.  He also noted that despite Merckling's claims that she needed

help changing clothing before the procedure, she was observed changing her

clothing without any help following the procedure.

When determining what weight to accord to a treating physician's opinion,

the commissioner considers several factors including  the length of the treatment

relationship and the frequency of examination, the nature and extent of the

treatment relationship, whether the treating physician provides support for his

findings, whether other evidence in the record is consistent with the treating

physician's findings, and the treating physician's area of specialty.  20 C.F.R. §

404.1527(d)(2).  In light of the many inconsistencies with the record and within

their own opinions, I find that the ALJ would likely have attributed little weight to

the treating physician's residual functional capacity opinions, and that they would

not have changed his findings.  See Davidson v. Astrue, 501 F.3d 987, 991 (8th

Cir. 2007) ("[A]n appropriate finding of inconsistency with other evidence alone is

sufficient to discount a treating physician's RFC") (internal quotation marks

omitted).  In making his decision, the ALJ relied heavily on much of the evidence

in the record that undercuts the opinions of the treating physicians.  This fact

suggests that the ALJ would not have been swayed by the belated opinions.

Moreover, when accorded less than controlling weight, the opinions tend to

support the ALJ's decision that Merckling was capable only of light work because

they are the first medical opinions which provide that Merckling has *any*

limitations at all.  I conclude, therefore, that the record as a whole, including the

evidence submitted to the Appeals Council, contains substantial evidence to

support the ALJ's finding of Merckling's residual functional capacity.

## Function by Function Analysis

Merckling's second argument is that the ALJ erred at step four by failing to

perform a function by function comparison of the demands of Merckling's past

relevant work with her residual functional capacity as required by Pfitzner v.

-36-

Apfel, 169 F.3d 566, 568-69 (8th Cir. 1999).  Pfitzner requires that the ALJ make

specific findings as to the claimant's limitations and how those limitations affect

the claimant's residual functional capacity.  Id. at 568.  The ALJ should then

"make explicit findings regarding the actual physical and mental demands of the

claimant's past work."  Id. at 569 (quoting Groeper v. Sullivan, 932 F.2d 1234,

1239 (8th Cir. 1991).  But, if, after a careful review of the record, the court

determines that a remand for the ALJ to perform these duties would not be of

assistance and the ALJ's failure to make the requisite findings did not prejudice

the claimant, then the court will not remand for further proceedings.  See Samons

v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007).

The Eighth Circuit's opinion in Samons v. Astrue is particularly instructive

in this case.  There, a claimant made an argument identical to Merckling's, that the

ALJ failed to perform the function by function analysis.  Id.  The ALJ determined

that the claimant retained the residual functional capacity to perform the full range

of light work, but did not detail the duties of her past work as a cook, babysitter,

housekeepr, or cashier.  Id.  The Eighth Circuit found that though the finding was

deficient, the claimant was not prejudiced because her past position of cashier was

defined in the Dictionary of Occupational Titles (DOT) as light work and the

Commissioner has indicated that the DOT is a resource for determining duties of

past relevant work.  Id.  The court thus found that, though the ALJ's findings were deficient, the claimant was not prejudiced and the court would not remand "absent unfairness or prejudice."  Id. at 822.

Here, while I agree that the ALJ failed to perform his duty to make the requisite findings concerning Merckling's past relevant work, I find that no prejudice resulted from the failure and a remand for further proceedings would not be of any assistance in this case.

Similarly to Samons, the ALJ here found that Merckling was able to perform the full range of light work.  Light work is defined as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  Additionally, The ALJ found no mental impairments. This finding is amply supported by the record.  Merckling's physciatric review showed  no medically determinable mental impairments.  No diagnoses of depression is supported by any objective evidence, and she was initially prescribed

depression medication to treat menopause related hot flashes.

While the ALJ failed to make explicit findings concerning Merckling's past relevant work, evidence on the record details the functions of Merckling's previous position. Merckling claimed in her testimony that as an account analyst she called customers to collect money. In addition, she testified that she worked at a desk and used a computer for the majority of the day. On her Disability Report - Adult - Form SSA-3368, Merckling reported that her job as an account analyst required her to use a computer, to walk for one hour per day, to stand for one hour per day, to sit for eight hours per day, to stoop for one hour per day, to climb for one hour per day, to reach for eight hours per day, and to type or handle small objects for eight hours per day. She stated her job required her to lift no more than ten pounds and to frequently lift less than ten pounds. The description of her job, as she previously performed it, falls well within the category of light work. Therefore, despite the ALJ's failure to make these explicit findings, there is substantial evidence on the record to support the ALJ's determination and no prejudice resulted.

In addition, section 241.357-010 of the DOT refers to a position that it calls a collection clerk and alternatively calls a delinquent-account clerk or a past-due account clerk. The entry is nearly identical to Merckling's past relevant work as

she has described it.  According to the DOT, a collection clerk "confers with [a] customer by telephone in attempt to determine [the] reason for overdue payment, reviewing terms of sales, service, or credit contract with [the] customer" and "records information about financial status of customer and status of collection efforts."  DOT § 241.357-010.  A collection clerk also performs more taxing duties that Merckling did not report performing such as to "[c]ontact[] delinquent account customers in person" and "may attempt to repossess merchandise, such as automobile, furniture, and appliances when customer fails to make payment."  Id. Despite these duties, the DOT still classifies the collection clerk as sedentary work.  Id.  This is well within the level of light work that Merckling's residual functional capacity allows her to perform.

I find, as the Eighth Circuit found in Samons that, although the ALJ erred by failing to make explicit findings as to the demands of Merckling's past relevant work, Merckling was not prejudiced by the error.  This court will not remand absent unfairness or prejudice.  Samons, 497 F.3d at 822.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is **affirmed**.

-40-

A separate judgment  in accord with this Memorandum and Order is entered this date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 4th day of January, 2012.